DECISION AND JOURNAL ENTRY
 INTRODUCTION {¶ 1} Deshawnda Travis was convicted of theft of childcare benefits from the Ohio Department of Job and Family Services. Ms. Travis was receiving day care services, paid for with Department funds, when she took a maternity leave from her job. She failed to tell her childcare services case worker that her status had changed and, therefore, continued to receive the benefits for two months while on maternity leave. Despite being given multiple opportunities to make arrangements to repay the money, she failed to do so. A jury convicted her of a felony theft offense. The trial court sentenced her to eight months incarceration, but suspended her sentence and placed her on three years community control. It also ordered her to make restitution in the amount of $2198.80. Ms. Travis has appealed. This Court affirms her conviction because it is supported by sufficient evidence and is not against the manifest weight of the evidence. *Page 2 
 SUFFICIENCY {¶ 2} Ms. Travis's first assignment of error is that the trial court incorrectly denied her motion for acquittal because her conviction was not supported by sufficient evidence. Under Rule 29(A) of the Ohio Rules of Criminal Procedure, a defendant is entitled to acquittal on a charge against her "if the evidence is insufficient to sustain a conviction. . . ." Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. State v.Thompkins, 78 Ohio St. 3d 380, 386 (1997); State v. West, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶ 33. This Court must determine whether, viewing the evidence in a light most favorable to the prosecution, it would have convinced an average juror of Ms. Travis's guilt beyond a reasonable doubt. State v. Jenks, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).
 {¶ 3} Ms. Travis was convicted of violating Section 2913.02(A)(2) of the Ohio Revised Code. That section provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services . . . [b]eyond the scope of the express or implied consent of the owner or person authorized to give consent." R.C. 2913.02(A)(2).
 {¶ 4} "Deprive," as used in Section 2913.02(A), is to "[a]ccept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return . . . and without reasonable justification or excuse for not giving proper consideration." R.C. 2913.01(C)(3). According to the Ohio Revised Code, "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Therefore, if Ms. Travis was "aware that *Page 3 
[her] conduct [would] probably" result in her obtaining unauthorized benefits from the Department of Job and Family Services, then she "knowingly" committed theft. R.C. 2901.22(B).
 {¶ 5} Helena Larios, Ms. Travis's childcare caseworker at the Department, testified that Ms. Travis completed childcare applications twice before taking maternity leave. The applications, which were received into evidence at trial, reveal that Ms. Travis applied for benefits in September 2002 and reapplied in August 2003, so that she could put her three children in daycare while she was at work.
 {¶ 6} The applications were both signed by Ms. Travis on the page titled, "Your Rights and Responsibilities." The form explained that "[c]hild care is only to be used during hours of employment or training." It further explained that "[c]hild care cannot be provided when there is a caretaker in the home who is capable of caring for the child. A statement from a doctor is necessary to verify when a caretaker is not capable of providing care." The form contained a bold print warning that, "You must report to the [Department] any change which would affect your child care benefits, including . . . change in hours of employment . . . within TEN DAYS of the date the change occurred." The bold print warning went on to define "[c]hild care fraud" and explain that a "[f]ailure to meet this reporting requirement may be considered fraud and may result in . . . repayment of child care benefits . . .; [or a] fine and/or imprisonment if convicted of fraudulently receiving child care benefits for which you were not eligible." In two additional places on the form, it reiterated that the applicant may be subject to legal penalties for failure to properly report status changes.
 {¶ 7} Ms. Larios, the caseworker for childcare benefits, testified that Ms. Travis called her to report that she had had her fourth child and was planning to return to work soon. *Page 4 
According to Ms. Larios, this was the first she had heard about Ms. Travis taking maternity leave. Clients are automatically ineligible for childcare benefits for any hours they are not "working, in school, or in training." The only exception would be if a doctor reported that the client was physically unable to care for the children. Clients may still wish to take their children to day care when they are not "working, in school, or in training," but the client is then responsible for the bill.
 {¶ 8} Ms. Larios testified that she learned from the childcare center that Ms. Travis had used their services for her older three children while she was on leave. Ms. Larios then explained to Ms. Travis that she was ineligible for benefits while on leave and that the cost of those services would have to be repaid to the Department. Ms. Larios testified that it was her understanding that the Department permitted clients to make reasonable payments toward such a debt. According to Ms. Larios, however, Ms. Travis was unwilling to repay the funds.
 {¶ 9} A Department of Job and Family Services investigator testified that her investigation revealed that Ms. Travis had used childcare services for three children for a two-month period while she was not working. As a result, the Department had paid bills totaling $2198.80. Ms. Travis wrote a voluntary statement in which she admitted using childcare services while on maternity leave. The investigator met with Ms. Travis and explained that she could set up a payment plan, but she never heard from Ms. Travis again.
 {¶ 10} The evidence was sufficient for a trier of fact to find that Ms. Travis had actual knowledge that she was not eligible for the childcare benefits she received while she was not working. Viewing the evidence in a light most favorable to the prosecution, it was sufficient to convince an average juror beyond a reasonable doubt that Ms. Travis knowingly deprived the Department of benefit funds for which she was not eligible while on maternity leave from her *Page 5 
job. Therefore, the trial court correctly denied her Criminal Rule 29 motions for acquittal. Ms. Travis's first assignment of error is overruled.
 MANIFEST WEIGHT {¶ 11} Ms. Travis's second assignment of error is that her conviction is against the manifest weight of the evidence. When a defendant argues that her convictions are against the manifest weight of the evidence, this Court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten, 33 Ohio App. 3d 339, 340 (1986).
 {¶ 12} Ms. Travis testified that she was aware that any changes in status had to be reported to her caseworkers within ten days. She testified that she called both of her caseworkers prior to taking maternity leave. Her cash benefits caseworker, Judith Green, testified that, weeks prior to beginning her maternity leave, Ms. Travis called to report the change in status. Ms. Green testified that she was in charge of determining eligibility for cash benefits, food stamps, and medical benefits. Some of those benefits increased to compensate for Ms. Travis's loss of income while she was on maternity leave.
 {¶ 13} Ms. Travis also testified that she spoke with Ms. Larios, her childcare benefits caseworker, by telephone, the day before her maternity leave began. She claimed that Ms. Larios never told her that her childcare benefits would be suspended during her leave of absence. Ms. Travis further testified that, near the end of her maternity leave, she attempted to call Ms. Larios several times. When she did not get a return call, Ms. Travis finally called Ms. Larios's *Page 6 
supervisor to report her for failing to return her calls. Ms. Travis argued that Ms. Larios turned the case over for investigation in retribution for the call to her supervisor.
 {¶ 14} Ms. Larios denied receiving any phone calls from Ms. Travis before the maternity leave began. She testified that Ms. Travis did not call her supervisor until after Ms. Larios had told her she would need to repay the money for the childcare hours used while she was not working. Ms. Larios maintained that Ms. Travis did not tell her about her maternity leave until it was time for her to return to work and add her newborn baby to the childcare case.
 {¶ 15} Ms. Travis has pointed out that Ms. Green, the cash benefits caseworker, confirmed that Ms. Travis had contacted her to report her impending maternity leave. She has argued that, because the application stated only that she must report status changes to the Department rather than to a specific caseworker, the State cannot prove she knowingly deprived the Department of funds. According to her, if she had been trying to hide her maternity leave, she would not have called either Ms. Green or Ms. Larios to report it.
 {¶ 16} It was reasonable for the jury to believe the childcare caseworker's testimony that Ms. Travis did not report the maternity leave to her until it was time for Ms. Travis to return to work. The evidence revealed that Ms. Travis had to call Ms. Larios at that time in order to obtain services for the new baby when she returned to work. Further, although the caseworker for cash assistance and food stamps confirmed that Ms. Travis did contact her prior to beginning her maternity leave, the evidence revealed that those services generally increase if a client is not working.
 {¶ 17} This Court cannot conclude that the jury lost its way and created such a manifest miscarriage of justice that Ms. Travis's conviction must be reversed and a new trial ordered. *Page 7 
Accordingly, the verdict is not against the manifest weight of the evidence. Ms. Travis's second assignment of error is overruled.
 CONCLUSION {¶ 18} Ms. Travis's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Therefore, the decision of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to appellant.
 SLABY, J., CONCURS *Page 8